Filed 10/15/14  In re Alexandria A. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re ALEXANDRIA A., a Person Coming Under the Juvenile Court Law. | D065871 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| Plaintiff and Respondent, | (Super. Ct. No. J514198) |
| v. | |
| GRAHAM A. et al., | |
| Defendants and Appellants. | |

APPEALS from findings and orders of the Superior Court of San Diego County,

Edlene C. McKenzie, Commissioner.  Affirmed.

Michele Anne Cella under appointment by the Court of Appeal for Defendant and

Appellant Sylvia M.

Elizabeth C. Alexander under appointment by the Court of Appeal for Defendant

and Appellant Graham A.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel, and Georgia A. Gebhardt, Deputy County Counsel, for Plaintiff and Respondent.

Stacey Otzmann under appointment by the Court of Appeal for Minor.

Graham A. and Sylvia M. appeal findings and orders entered at a permanency plan and selection hearing for their daughter, Alexandria A., under Welfare and Institutions Code section 366.26.[1] They contend that the court erred when it found that Alexandria did not have a beneficial parent/child relationship with her father and terminated their parental rights. We affirm.

FACTUAL AND PROCEDURAL BACKGROUND

Alexandria A., who was born in 2006, is the daughter of Graham A. and Sylvia M. Graham and Sylvia were together from approximately 2004 to 2009. They each had a history of substance abuse. Sylvia had lost her parental rights to another child due to her substance abuse. After Graham and Sylvia separated, Graham saw Alexandria almost every week. She stayed with him overnight at the home of her paternal grandmother.

In May 2012, the San Diego County Health and Human Services Agency (Agency) detained then five-year-old Alexandria in protective custody after Sylvia was arrested on charges of child endangerment, being under the influence of methamphetamine, and possession of drug paraphernalia. (§ 300, subd. (b).) Sylvia's

---

[1] Further statutory references are to the Welfare and Institutions Code.

2

roommates were arrested on charges that they were selling methamphetamine from the home in which Alexandria was living. Drugs and drug paraphernalia were scattered throughout the home and were accessible to Alexandria.

When interviewed by the social worker at the time Alexandria was detained, Graham acknowledged that he had a history of intermittent methamphetamine and marijuana use dating to approximately 1983. He said that he had not used methamphetamine in approximately eight months, but he admitted that he continued to drink and use marijuana. Graham said that he was aware that Sylvia's home was dirty but that recently, she would not allow him to enter the home when he picked up Alexandria for visits. He suspected that Sylvia was using methamphetamine. Graham was concerned for his daughter's health and safety and asked Sylvia to allow Alexandria to live with him, but Sylvia would not allow it. Graham did not report his concerns to authorities. He discounted Alexandria's reports that her mother had kicked, hit and punched her because he knew Sylvia to be "more of a yeller," but then acknowledged that he would not be surprised if Sylvia had in fact "physically disciplined" Alexandria. The social worker reported that Graham denied any wrongdoing and did not appear to understand that he had failed to protect his daughter by not reporting his concerns about Alexandria's circumstances to authorities.

The juvenile court sustained the allegations in the section 300 petition, removed Alexandria from her mother's custody, and ordered a plan of reunification services for each parent.

The Agency placed Alexandria with her maternal great-aunt (aunt) in May 2012. The aunt had cared for Alexandria from time to time before Alexandria was detained in protective custody. Alexandria appeared to be comfortable and happy in her aunt's care. Alexandria was in kindergarten, and was performing at grade level, with no developmental concerns. However, she lacked appropriate boundaries with her peers. She was unable to stay seated during class. In addition, Alexandria chased boys, trying to kiss them, and told one boy, "If you don't love me I'll kill you." At home, Alexandria presented with defiant and manipulative behaviors, and disregarded adult instruction in favor of doing things for herself. The Agency implemented behavioral services and individual therapy. Because of her aunt's health, in February 2013, Alexandria was placed in foster care with supportive behavioral services.

During the reunification period, Sylvia did not complete any court ordered services. Sylvia did not consistently visit Alexandria, who did not appear to be bonded with her mother.

Graham did not complete any service components of his case plan during the reunification period and was unable to maintain his sobriety for any significant period of time. Graham enrolled in an outpatient substance abuse treatment program in July 2013, but relapsed in August when he went to a bar. Graham enrolled in another outpatient treatment program in September. His counselor reported that Graham was very committed to his recovery and had a good attitude, but that he had tested positive for low levels of THC on admission, indicating prior marijuana use. Graham relapsed in November, again testing positive for THC. Graham engaged in therapy from August to

4

November 2012, when he stopped attending. In January 2013, Graham began an 11-day detox program. However, he left the program after only a few days. Graham started an inpatient substance abuse treatment program in April. Program staff reported that he was doing well and had a good attitude. However, Graham relapsed in May, and admitted to alcohol, marijuana and methamphetamine use. Graham was allowed to reenter the 28-day residential treatment program, but he left the program after only six days.

The social worker reported that Graham maintained consistent and positive visitation with Alexandria throughout the 12-month review period. He visited her once or twice a week for approximately six hours per visit under the supervision of the paternal grandmother. Alexandria's foster mother reported that Alexandria was often very excited to see her father and that she asked about him between visits. The social worker said that it was very apparent that Graham and Alexandria were bonded; however, with Graham's pattern of relapse and lack of progress with services, it was unlikely that Alexandria would be able to reunify with him by the 18-month review hearing.

At the 12-month review hearing, the court terminated reunification services and set a section 366.26 hearing.

The adoptions social worker (social worker) met with Alexandria and asked her where she would like to live if she could live anywhere in the world. Alexandria replied, "I want to live with my daddy in a big white house with a dog and cat." When asked to make another choice, Alexandria said she wanted to stay with her current foster mother "forever until I'm 18." The social worker asked her if she would like to meet a new family where she could live forever. Alexandria replied, "No," and then said, "Well,

5

maybe."  When the social worker brought up the subject of adoption at later visits, Alexandria repeatedly insisted that she wanted to stay with her foster mother.

While Alexandria's foster mother was willing to serve as Alexandria's long-term guardian, she did not believe that it would be appropriate for her to adopt Alexandria, due to her health issues.  Alexandria's aunt and her paternal grandmother (Grandmother) were unable to adopt Alexandria due to their ages and health.  The social worker also contacted other family members, including one of Graham's three adult daughters, and extended family members who had expressed interest in adopting Alexandria, but none came forward to begin the adoption process.

In November 2013, the social worker was contacted by a friend of Alexandria's foster mother who had known Alexandria since February and was interested in adopting her.  The friend had an approved and active adoptive home study.  The social worker thought that placement with the foster mother's friend was a better alternative for Alexandria than moving her to a stranger's home, which the social worker believed had the potential to emotionally traumatize Alexandria.

A clinical psychologist conducted a bonding study of Alexandria and Graham in December 2013.  The psychologist observed that Alexandria eagerly and directly sought contact with Graham, whom she called "daddy."  Alexandria told the psychologist that she wanted to live with her father and said that if she could not live with him, she wanted to stay with her foster mother.  When given three wishes, Alexandria said:  "That I could live with my dad, that I could . . . go in the pool with daddy, and that it'd be sunny every day."  She chose her father as the person she would want to tuck her in bed at night, to

cook and feed her dinner, to care for her while she was sick, and to comfort her when she was scared. Alexandria said she would perform a number of tasks by herself, which the psychologist viewed as exaggerated independence that was likely derived from her early life experiences.

According to the psychologist, Alexandria perceived Graham as the primary parental figure in her life. While there clearly was a need for stability and predictability in Alexandria's life, there were possible long-term detrimental effects in terminating all contact between Alexandria and her father. The psychologist cited research that indicated that children who had continued contact with their biological parents generally fared better than children whose contact was completely terminated.

The section 366.26 hearing was held on March 11, 2014. The court admitted the Agency's reports and the bonding study in evidence, and heard testimony from the social worker, Grandmother, and Graham.

The Agency recommended that the court terminate parental rights. Alexandria was adoptable. She was attractive and healthy, inquisitive and precocious, and very intelligent. Overall, she presented as a happy child. Alexandria was still receiving in-home services to help manage her behaviors.

The social worker observed several visits between Alexandria and Graham. She reported that Alexandria had fun playing with her father. Graham doted on Alexandria and she reciprocated with hugs and kisses. He was firm and set boundaries with her. Graham helped Alexandria with her math homework and made sure that she understood the math concepts. When she became frustrated with her homework, he gently

7

encouraged her to continue. The social worker observed another visit during which Alexandria and Graham baked cupcakes together. The social worker commented, "The overall nature of [their] interaction was [as] playful, sweet, and loving as I had witnessed during the first visit. It is evident to this worker that Alexandria and her father have a special relationship and have an attachment to each other. Alexandria knows [Graham] as her father and appears to adore him."

The social worker observed two additional visits between Alexandria and Graham in December 2013. She said that those visits confirmed her initial observation that Alexandria and Graham shared a reciprocal attachment. Alexandria greatly enjoyed her visits with her father and they continued to share a close, special relationship. During the visit, Alexandria wrote a note to Graham that said "I love you daddy." Alexandria's foster mother reported that Alexandria was crying after a visit. When asked why she was sad, Alexandria said, "I miss my daddy."

The Agency placed Alexandria in the home of the foster mother's friend and the friend's husband (caregivers) in February 2014. The social worker explained the differences between guardianship and adoption to the caregivers. The caregivers preferred to adopt Alexandria.

At the first visit with her father after she was placed with the caregivers, Alexandria was playing with a handheld electronic toy when Graham arrived. She did not look up to greet him. The social worker introduced Graham to the caregivers. Graham then turned his attention to Alexandria, who continued to ignore him. When Graham and Alexandria went into the playroom, he pressured Alexandria to write a letter

8

to Sylvia, telling her that her mother loved her very much. Alexandria refused to write the letter and displayed some anxiety. When Graham questioned Alexandria about her new home, Alexandria became uncomfortable. She began to talk in baby talk. Alexandria got down on her hands and knees and crawled out of the room to join her caregiver. The caregiver prompted Alexandria to return to her father. During the rest of the visit, Alexandria appeared to be as comfortable with Graham as she had been during the other visits that the social worker had observed. Graham helped Alexandria with her homework. She hugged him goodbye and told him that she loved him. As Alexandria was leaving, she asked the social worker, "When will I get to see my dad again?"

After the visit, the caregivers told Alexandria that she would visit with her dad sometime soon and that she would live with them and they would be her forever family. The caregivers promised Alexandria that she would be able to see her father occasionally, even if she was adopted.

The social worker stated that while Alexandria had a bond with her father, the dynamics of that bond was changing as Alexandria settled in at her prospective adoptive home. Alexandria knew that the caregivers wanted to be her forever family, and she appeared to be happy and excited at the prospect of being adopted. The social worker recommended that visitation continue between Alexandria and her parents and extended family. The social worker acknowledged that a decision to continue visitation would ultimately be at the adoptive family's discretion.

The social worker testified that Alexandria's relationship with Graham was playful, sweet and affectionate. Graham doted on his daughter and she often reciprocated

9

his affection. She was attached to him. They were attuned to each other's emotional needs. However, in the social worker's opinion, Graham did not maintain a parental role with Alexandria. Alexandria needed the stability and security of adoption and the comfort of knowing that she would not have to move again. Based on her latest conversations with Alexandria, the social worker believed that Alexandria wanted to be adopted by her caregivers. The social worker acknowledged that she had not told Alexandria that she would not see her father every week. Alexandria was not aware that adoption meant that she might not be able to see her father again.

Grandmother wanted Alexandria to remain with her foster mother, who had "worked miracles" in resolving Alexandria's behavioral problems. Grandmother testified that Alexandria was genuinely affectionate with her father. He acted as a parent to her. He made the decisions and answered her questions. When she and Alexandria drove away from visits, Alexandria always pushed her face against the car window until she could no longer see her father. Grandmother believed that Alexandria would be "very sad" if she lost her relationship with her father.

Graham testified that it would be harmful to Alexandria if he were not in her life. They shared an unmistakable bond. Graham said that with good care, Alexandria may grow up to be happy in some sense but he did not believe that she would have the same degree of happiness without him in her life.

Prior to issuing its ruling, the court said the issue in this case was whether the relationship between Alexandria and Graham outweighed the benefit to her of having a permanent home. The bonding study was helpful because it identified that Alexandria

10

viewed her father as her primary parental figure, but acknowledged that the continuation of their relationship had to be viewed and weighed against the long-term benefits of adoption. Alexandria had not lived with her father for at least five years. There was no indication that Graham would be in a position to care for Alexandria any time in the near future. The court noted that it had not received much information about the effect that terminating the parent/child relationship would have on Alexandria's well-being, and did not know whether Alexandria appreciated the gravity of adoption and what it meant. After reviewing the evidence, the court stated:

> "[O]n balance, I think the scale has been tipped and the Court is going to make a finding that the benefits of adoption, having a permanent home for her, someone who's going to be there on a day-to-day basis, take care of her education, her psychological needs, provide her with the stability that a permanent home can bring, outweigh the benefits [of maintaining the parent/child relationship]."

After finding that Sylvia had not maintained regular visitation and contact with Alexandria, the court found that Alexandria was likely to be adopted and that adoption was in her best interests. The court terminated parental rights.

DISCUSSION

A

*The Beneficial Parent/Child Relationship*

Graham and Sylvia[2] contend that the juvenile court erred when it terminated their parental rights[3] to Alexandria because the evidence established that Graham maintained regular contact and visitation with his daughter and that Alexandria would benefit from continuing that contact. (§ 366.26, subd. (c)(1)(B)(i).) They argue that this case has many parallels to *In re S.B.* (2008) 164 Cal.App.4th 289 (*S.B.*), in which this court reversed a judgment terminating parental rights of a father whose young daughter was very bonded with him.

At a section 366.26 hearing, the court may select one of three permanency plans: adoption, guardianship or long-term foster care. (*In re Taya C.* (1991) 2 Cal.App.4th 1, 7.) There is a strong preference for adoption over alternative permanency plans. (*In re Michael G.* (2012) 203 Cal.App.4th 580, 588-589.) If the court determines that the child is likely to be adopted, the burden shifts to the parent to show by a preponderance that termination of parental rights would be detrimental to the child under one of the

---

[2]　In her briefing, Sylvia raises only the claim that Graham and Alexandria shared a beneficial parent/child relationship and that the court therefore erred when it terminated parental rights. Each parent joins in the other's argument.

[3]　The court may not terminate the rights of only one parent under section 366.26 unless that parent is the only surviving parent or the rights of the other parent have been terminated under applicable provisions of the Family Code, or the other parent has voluntarily relinquished the child to the child welfare agency. (Cal. Rules of Court, rule 5.725(a)(2).)

exceptions listed in section 366.26, subdivision (c)(1). (*In re Lorenzo C.* (1997) 54 Cal.App.4th 1330, 1343-1345; but see § 366.26, subd. (c)(1)(A).)

An exception to termination of parental rights exists when "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).) " '[B]enefit from continuing the . . . relationship' " means " 'the [parent/child] relationship . . . promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents.' " (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575 (*Autumn H.*).)

Where the parent has continued to regularly visit and contact the child, and the child has maintained or developed a significant, positive, emotional attachment to the parent, "the court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging that a new family would confer. If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.)

We adopt a hybrid standard of review to determine whether the court erred in deciding whether the beneficial parent/child relationship exception to termination of parental rights applies. (See *In re J.C.* (2014) 226 Cal.App.4th 503, 530; *In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314-1315 (*Bailey J.*) We review the court's finding as to whether "the parents have maintained regular visitation and contact with the child and the

13

child would benefit from continuing the relationship" for substantial evidence (§ 366.26, subd. (c)(1)(B)(i)). (*Bailey J.*, at p. 1314.) "The second determination in the exception analysis is whether the existence of that relationship or other specified statutory circumstance constitutes 'a compelling reason for determining that termination would be detrimental to the child.' (§ 366.26, subd. (c)(1)(B); see *Bailey J.*, at p. 1315.) This ' "quintessentially" discretionary decision, which calls for the juvenile court to determine the *importance* of the relationship in terms of the detrimental impact that its severance can be expected to have on the child and to weigh that against the benefit to the child of adoption,' is appropriately reviewed under the deferential abuse of discretion standard. (*Bailey J.*, at p. 1315.)" (*In re K.P.* (2012) 203 Cal.App.4th 614, 622.)

This record leaves no doubt that Graham maintained regular visitation and contact with Alexandria and that she would derive some benefit from continuing the relationship. They had a sweet, loving and playful relationship. However, the court found that the balance "tipped" toward finding that Alexandria would derive greater benefit from the security and stability of adoption than she would from continuing the parent/child relationship. (*Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.) We cannot conclude that the court abused its discretion.

The record shows that Graham's relationship with Alexandria was parental in nature in all but its most important aspects: providing safety, security and stability. Sylvia had had an intractable drug problem for many years. The record shows that from the age of approximately two years, Alexandria lived in chaotic conditions. She did not have a bonded relationship with her mother, who was her primary caregiver. Graham did

14

not act to protect Alexandria from her mother's neglect. Due to his inability to maintain his sobriety, he was not able to offer a safe and stable home to Alexandria. At the time Alexandria was detained in protective custody, Graham said that he had stopped using methamphetamine only eight months earlier. After Alexandria was adjudicated a dependent of the juvenile court, she had two placements in less than two years and required extensive in-home services to manage her behavioral needs at school and at home.

In some respects, this case is similar to *In re Dakota H*. (2005) 132 Cal.App.4th 212 (*Dakota H*.), in which this court upheld a judgment terminating parental rights to an eight-year-old child whose needs for stability, predictability and highly competent care outweighed the benefit that he would gain from continuing his relationship with his loving and devoted parent, who nevertheless was unable to meet her son's needs. (*Id*. at p. 218, 230.) Like the parent in *Dakota H*., Graham had a loving relationship with his daughter. Like Dakota, Alexandria required stability, security and consistent behavioral support. In that case, like this one, the record shows that the court properly and carefully assessed Alexandria's best interests within the context of her long-term needs. (*Id*. at pp. 229-230.) "Unlike adoption, other permanency options are not equivalent to the security of a permanent home. [Citation.]" (*Id*. at p. 231.)

Graham and Sylvia contend that this case is similar to *S.B*., in which this court concluded that the juvenile court erred when it determined that termination of parental rights would not be greatly detrimental to the child. (*S.B*., *supra*, 164 Cal.App.4th at p. 301.) However, as the parents acknowledge in their briefing, the cases are dissimilar in

several crucial aspects. Unlike the father in *S.B.*, Graham was unable to maintain his sobriety. He did not take all the steps that were available to him to resolve the problems that led to the continuation of his daughter's dependency proceedings. (*Id*. at p. 298.) From the beginning of her dependency proceedings, S.B. remained with her maternal grandmother, with whom she had a strong, positive and significant relationship. (*Id*. at p. 300.) Thus, S.B.'s circumstances were far more stable than Alexandria's circumstances. In addition, Alexandria required extensive behavioral services. Further, unlike Graham, who did not complete any of the service components of his case plan, S.B.'s father had complied with every aspect of his case plan and maintained his sobriety. (*Id*. at p. 298.) Thus, if something were to happen to S.B.'s placement with her grandmother, S.B.'s father would likely have been able to care for his daughter with supportive services, and she would not face another temporary placement. (*Id*. at pp. 295.)

Here, in contrast, if Alexandria's placement with the foster mother were to fail, there was no one who could provide any continuity of care to Alexandria. The record clearly shows that Graham was unable to maintain his sobriety for any appreciable length of time. Grandmother and aunt were not able to provide day-to-day care for her. This would have led to yet another placement for Alexandria, with potentially traumatizing effects on her emotional health and well-being. Further, the court could draw a reasonable inference that in view of Graham's ongoing substance abuse and his lack of amenability to treatment, it was not in Alexandria's best interest to rely on the stability of her bond with her father in balancing the benefits of adoption against maintaining the parent/child relationship.

16

Graham argues that some authors have criticized the "winner take all" mentality of case law supporting the termination of parental rights (see D.E. Arrendondo and L.P. Edwards, *Attachment*, *Bonding*, *and Reciprocal Connectedness*, Journal of the Center for Families, Children & the Courts (2000), pp. 109-127), and contends that this court should not affirm the order terminating parental rights because Alexandria had a significant, primary attachment to her father.  Although the Legislature has recently recognized such multiple parental relationships in the context of family law cases (see Fam. Code, § 7612, subd. (c), as amended by Stats. 2013, ch. 510, § 4), it has not extended that recognition to parents of those abused or neglected children whose interests require termination of parental rights.  The Legislature has made it clear that except in extraordinary cases, adoption is the preferred placement for a child who has been abused or neglected and cannot be safely returned to the care of his or her parent.  (*In re Michael G.*, *supra*, 203 Cal.App.4th at pp. 588-589.)  It is the Legislature's role to determine whether the parent/child relationship of a child who derives more than an incidental benefit from that relationship, but whose long-term needs for security, stability and permanency mandate termination of parental rights, should be afforded some type of legal protection.  (See *In re M.C.* (2011) 199 Cal.App.4th 784, 815 fn. 24.)

We conclude that the court did not abuse its discretion when it determined that the parent/child relationship did not promote Alexandria's well-being to such a degree as to outweigh the well-being that she would gain in a permanent home with new, adoptive parents, and terminated parental rights.  (*Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.)

17

DISPOSITION

The findings and orders are affirmed.

_____
AARON, J.

WE CONCUR:

_____
McCONNELL, P. J.

_____
O'ROURKE, J.